UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLOUGHBY DOUGLAS and LOVECORA DOUGLAS,<br><br>*Plaintiffs*,<br><br>v.<br><br>WALMART, KELLY G. MOORER, JR., RORY J. MEYER, RACHEL BITJEMAN, and CHARLES BLACKBURN,<br><br>*Defendants*. | No. 24-CV-3030 (KMK)<br><br>OPINION & ORDER |

Appearances:

Willoughby Douglas
Lovecora Douglas
South Richmond Hill, NY
*Pro se Plaintiffs*

Michael P. Cavanagh, Esq.
O'Connor, O'Connor, Bresee & First, PC
Albany, NY
*Counsel for Defendants Walmart and Kelly G. Moorer, Jr.*

Khalid Bashjawish, Esq.
Monticello, NY
*Counsel for Defendants Rory J. Meyer, Rachel Bitjeman, and Charles Blackburn*

KENNETH M. KARAS, United States District Judge:

Willoughby Douglas ("Mr. Douglas") and Lovecora Douglas ("Ms. Douglas") (together, "Plaintiffs"), a husband and wife, bring this Action against the Walmart Corporation ("Walmart"), Kelly G. Moorer, Jr. ("Moorer"), Rory J. Meyer ("Meyer"), Rachel Bitjeman ("Bitjeman") and Charles Blackburn ("Blackburn," and together with Meyer and Bitjeman, the "Officers") (collectively, "Defendants"), seeking compensatory and punitive damages, attorneys'

fees, and costs. (Am. Compl. ¶¶ 1–6, 7 (Dkt. No. 56).) Defendants Walmart and Moorer filed a Motion for Summary Judgment, (Mot. for Summ. J. ("Walmart's Mot.") (Dkt. No. 79)), as did the Officers (First Mot. for Summ. J. ("Officers' Mot.") (Dkt. No. 81)). For the reasons that follow, Defendants Walmart and Moorer's Motion for Summary Judgment is granted in its entirety, and the Officers' Motion for Summary Judgment is granted in part and denied in part.

## I. Background

### A. Factual Background

The facts described herein are drawn from the Parties' Rule 56.1 statements and their exhibits. (*See* Mot. for Summ. J., Ex. Defs' Statement of Material Facts ("Walmart Defs.' 56.1") (Dkt. No. 79-10); First Mot. for Summary Judgment, Ex. Statement of Material Facts ("Officers' 56.1") (Dkt. No. 81-1); Pls.' Response to Defs.' 56.1 Statement ("Pls.' 56.1") (Dkt. No. 93).) They are not in dispute unless noted otherwise. In light of special solicitude afforded to pro se litigants, the Court has reviewed the factual record searchingly despite Plaintiffs' failure to contest several critical portions of the Defendants' Rule 56.1 Statements of Fact. (*See* Pls.' 56.1) *See Lugo v. Le Pain Quotidien*, No. 13-CV-6450, 2015 WL 1808558, at *1 (S.D.N.Y. Apr. 13, 2015) ("In light of this duty and mindful of the [c]ourt's obligation to grant 'special solicitude' to pro se litigants who oppose motions for summary judgment, the [c]ourt has considered the evidence in the record despite [the p]laintiff's failure to submit a statement pursuant to Local Civil Rule 56.1."), *aff'd*, 654 F. App'x 7 (2d Cir. 2016) (summary order); *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001))).

Facts are treated as undisputed only where the evidence in the record is insufficient to support a material dispute of fact.

Late on July 10, 2023,[1] Plaintiffs were shopping at a Walmart store in Thompson, New York. (Officers' 56.1 ¶ 1; Pls.' 56.1 ¶ 1.) They went to the store to obtain ingredients for a restaurant that they owned and operated together, Red Diamond Island Bar & Grill. (Walmart's Mot., Ex. G ("Ms. Douglas Dep."), at 28:25–29:7, 29:19–21, 53:14 (Dkt. No. 79-8).) Upon completing their shopping, Plaintiffs proceeded to the self-checkout lane and, it appears, began using a self-checkout station. (*See* Officers' 56.1 ¶ 2; Pls.' 56.1 ¶ 2.)

Defendant Kelly Moorer, a Walmart employee, was working that night as an "Asset Protection Investigator," in which role he would prevent individuals from taking merchandise from the store without paying. (Officers' 56.1 ¶ 3; Pls.' 56.1 ¶ 3.) At the Thompson, New York, Walmart, the Asset Protection Investigator—like the guard in Bentham's *Panopticon*—watches live video feed of the entire store, including individuals using the self-checkout lane, remotely from his office via live camera feed. (Officers' 56.1 ¶ 5.) He saw Plaintiffs using the self-checkout system.[2] (Officers' 56.1 ¶ 5.) From there, accounts diverge.

[1] In the Officers' 56.1 Statement, they assert that these events occurred on or around July 11, 2023, based on Mr. Douglas's hospital admission paperwork. (*See* Officers' 56.1 ¶ 1 n.1.) However, the depositions submitted in support of the Summary Judgment Motions suggest that Plaintiffs came to the Walmart very late on July 10, 2023, and that Mr. Douglas was admitted to the hospital very shortly after midnight on July 11, 2023. (*See, e.g.*, Officers' Mot., Ex. A ("Moorer Dep."), at 11:21–25 (Dkt. No. 81-7) ("Q. At the time we're speaking about on July 10th at approximately, ten-thirty, eleven o'clock at night, how many people were there monitoring [the Walmart Store's floor]? A. I don't remember."); Officers' Mot., Ex. B ("Mr. Douglas Dep."), at 22:18–21 (Dkt. No. 81-8) (asking Mr. Douglas whether he understood that the deposition was occurring "to ask you questions about something that happened on July 10, 2023); Officers' Mot., Ex. G (Dkt. No. 81-13) (medical records indicating that Mr. Douglas was admitted at 0044 hours on July 11, 2023).)

[2] Although Plaintiffs purport to dispute that Moorer was watching them use the self-checkout machine through the video system, (Pls.' 56.1 ¶ 5), they do not specify any basis to

1. Moorer's Account[3]

Moorer reports that, on the night in question, he saw the Plaintiffs, and specifically Lovecora Douglas, placing "[s]everal items . . . on the register at one time," rather than placing the items one by one. (Moorer Dep. 14:24–25, 15:18–20.) He says that he saw Willoughby Douglas "take" these items "and put [them] in the cart." (*Id.* at 16:2–3.) Some of the items had been scanned before they were "put . . . in the cart," "but not all of them"; this failure to scan all the items occurred "several times." (*Id.* at 17:3–5; *see also id.* at 64:7–67:5.) Moorer left his office and approached Plaintiffs. (*See id.* at 20:25.) He "explain[ed] . . . that there were things in their cart that" had not been "scanned, and . . . asked . . . if [he] c[ould] see their receipt." (*Id.* at 20:25–21:4.) In response, one of the Plaintiffs handed the receipt to Moorer. (*Id.* at 21:11–12.) Moorer says that he "spotted something in the cart" that "wasn't on the receipt, so [he] then asked [Plaintiffs] to step into the office." (*Id.* at 25:7–9.) Moorer then looked through the cart, comparing what was in the cart to what was on the Plaintiffs' receipt. (*Id.* 26:20–27:3.) He began to sort the items, placing those that (as indicated on the receipt) were paid for into one cart, and those that did not appear on the receipt into another. (*Id.* at 26:18–27:6.) By the time of his deposition, Moorer could not remember which items had been placed in the cart unpaid, nor could he remember a smattering of other relevant details. (*E.g. id.* at 25:5–17.) Moorer

---

dispute that fact, nor any alternative means by which Moorer would have seen them and singled them out to approach, and the Court has not been able to discern any facts in the materials submitted that would support a contrary conclusion.

[3] The Court notes that Moorer's and Mr. Douglas's accounts are each somewhat inconsistent and contradictory on minor points. In light of Plaintiffs' *pro se* status, the Court has endeavored to create a cohesive narrative presented in the light most favorable to Plaintiffs as the nonmoving Parties.

reports that Willoughby Douglas "was cursing" during this interaction, speaking loudly, and "arguing with [him], telling [him] that he paid for everything." (*Id.* at 27:9–11, 16, 34:10.)

Moorer said that he was unable to complete the item-sorting process while he and Mr. Douglas were in the office. (*Id.* at 29:11–12.) Rather, Mr. Douglas left the office without asking permission and went into the lobby, over Moorer's objection. (*Id.* at 30:6–21.) While outside the office, Mr. Douglas "was yelling." (*Id.* at 37:3–4.) Moorer says that he continued to try to sort the cart but was unable to do so because Mr. Douglas "snatched items out of [his] hand," and specifically grabbed some type of fruit. (*Id.* at 31:6–11.) Mr. Douglas also took items out of the second cart, where Moorer had been placing the unpaid items, and put them back into the cart of paid items. (*Id.* at 33:18–24.) Moorer could not recall the specific items being moved. (*Id.* at 34:4–6.)

Moorer followed Mr. Douglas towards the lobby, at which point he called the Sheriff's and his supervisor. (*Id.* at 31:19–22.) Some time must have elapsed after this call and before the Officers' arrival, though Moorer could not recall any of the details about what occurred during that time. (*Id.* at 35:16–36:22.) In response to the call, the Officers came to the Walmart. (*Id.* at 35:16–20.) Moorer described the situation to one of the officers and turned over the receipt. (*Id.* at 58:12–17, 59:13–15.) Moorer could not recall much else of their interaction. (*See id.* at 58:1–62:18.)

2. Mr. Douglas's Account

Moorer's account differs from that described in Mr. Douglas's deposition. Mr. Douglas recounted that he and Ms. Douglas came to the Walmart with one of their children and were shopping in the store. (Mr. Douglas Dep. at 24:5–25:11.) After they used the self-checkout and were headed to the store's exit, Moorer approached him and Ms. Douglas and indicated that he

thought there was something in the cart that had not been paid for. (*See id.* at 34:15–25, 35:12–16.) Moorer asked Mr. Douglas to accompany him into an adjacent room. (*Id.* at 35:12–16, 36:2–6.) Mr. Douglas had given Moorer his receipt; Moorer used the receipt to review whether all the items in the cart were paid for. (*Id.* at 37:17–24.) According to Mr. Douglas, Moorer told him that certain items had not been paid for but then would put *the same items* back into the cart and say that the *same items* <u>had</u> been paid for. (*Id.* at 38:18–39:22.) Mr. Douglas did not understand this odd behavior. (*Id.* at 39:13–14.)

Mr. Douglas appears to concede that he was frustrated with Moorer; he said to the employee, "[W]hy [do] you come to punish us like we're criminals, like something is not paid for?" (*Id.* at 35:20–22.) Moorer reportedly said that Mr. Douglas was stealing something and stated, "I'm calling the cops." (*Id.* at 35:23–25.) Later in his deposition, however, Douglas claimed that Moorer did not tell him that he was going to call the police, but someone "else told [Moorer] to call the police." (*Id.* at 40:23–24.)

At some point, Mr. Douglas left the office. (*Id.* at 50:2–9.) Mr. Douglas then moved to the store's front entrance, where, near the vestibule, he encountered police officers. (*Id.* at 44:14–23.) Moorer appears to have been behind him, still in the office, but he shortly followed Mr. Douglas out into the store. (*Id.* at 119:15–120:2.) Mr. Douglas says that, at some point while in front of the officers, Moorer again moved merchandise out of his cart, putting it in a separate cart to indicate that it had <u>not</u> been paid for, then moved it back to his cart, indicating that the same merchandise <u>had</u> been paid for. (*Id.* at 51:17–52:10.) Mr. Douglas says that he tried to explain what had occurred between himself and Moorer. (*Id.* at 45:10–24.) He took his receipt out and said to an officer, "You see that I'm right," but apparently was unsuccessful in conveying this point. (*Id.* at 52:18–19.) Frustrated with the interaction, he took his phone out

intending to call his lawyer. (*Id.* at 48:24–49:5, 52:4–10.) In response, Mr. Douglas claims that one of the officers then began to yell at him, and that he was eventually handcuffed. (*Id.* at 45:2–3, 49:6.) As he was being handcuffed, Mr. Douglas said, "[W]hy [are] you doing that to me?" (*Id.* at 55:2–3.) Defendant Meyer then bit him on the shoulder, an officer "put" his foot,[4] and an officer "dropped [him] on the floor." (*Id.* at 55:4–6, 55:17.) During this entire process, Mr. Douglas reports, he never raised his voice. (*Id.* at 56:5–8.) His wife and daughter were present. (*Id.* at 57:13–14.) At no point did Moorer touch him. (*Id.* at 56:9–56:12.)

Next, Plaintiff lost consciousness. (*Id.* at 57:16–58:9.) When he came to, he was in an ambulance. (*Id.* at 58:10–12.) He was brought to Harris Hospital. (*Id.* at 59:5.) In terms of symptoms, Plaintiff reports that he was having difficulty breathing, his arm was injured, and he had a bite on his shoulder. (*Id.* at 59:9–11.) Plaintiff claims that, save the bite mark, these issues have persisted since the time of the incident, and that multiple doctors in the County refused to treat him because the incident involved the police. (*Id.* at 70:7–72:13 (asserting that doctors did not want to treat Mr. Douglas because the injury came about as part of a police incident); *id.* at 72:14–73:13 (reporting that Mr. Douglas, in June 2024, was next able to receive treatment from a doctor in Queens, where he had moved); *id.* at 73:14–75:21 (reporting that Plaintiff was unable to receive effective treatment before he moved to Queens, and that providers would do no more than prescribe him pain medicine); *see also* Ms. Douglas Dep. 48:23–52:6 (reporting same issues).) Later, he was brought by the police to the police station, where the "older police officer" who had been involved in his arrest spoke to him. (Mr. Douglas Dep. 62:10–14, 64:8–11, 67:8–13.) The older police officer said, "[S]orry what happened. It didn't have to reach this

---

[4] It is not clear from the deposition what Mr. Douglas meant by "put."

far, but take it up with Walmart. It wasn't [the police's] fault." (*Id.* at 65:9–12.) He was fingerprinted and spent about 10 to 15 minutes getting processed. (*Id.* at 64:12–15, 65:22–25.) At some point, Mr. Douglas claims, his wife may have been arrested. (*Id.* at 66:10–11.)

3. Ms. Douglas's Account

Ms. Douglas described the events as follows. She was scanning merchandise and she and her husband were bagging it together. (Ms. Douglas Dep. 32:2–34:25.) The couple was "moving quickly," because the store was about to close and it was "crowded and late." (*Id.* at 35:2–6.) After finishing scanning items, Ms. Douglas noticed that the machine had not generated a receipt and spoke to a woman (apparently a Walmart employee) who went to her station and printed the receipt. (*Id.* at 35:15–23.) Ms. Douglas says she asked if there were any errors, as she had never had this receipt issue before; in response, the employee assured her that everything was fine. (*Id.* at 35:24–36:4.) Ms. Douglas showed the receipt to an individual near the store's door, who checked it and said "okay"; accordingly, Ms. Douglas kept walking towards the exit. (*Id.* at 36:7–14.)

Just before the door, in the building's vestibule, Moorer stopped Ms. Douglas, her husband, and daughter, and said that an item in the cart had not been scanned. (*Id.* at 36:17–21, 41:13–23.) Ms. Douglas was confused because, from her perspective, she had just checked the receipt with two employees. (*Id.* at 36:22–37:1.) She says that Mr. Douglas began to talk to Moorer, after which point she was not particularly involved in the interaction. (*Id.* at 37:4–7.) Moorer directed her husband into his office, and Ms. Douglas waited in the doorway. (*Id.* at 42:2–19.) She could not hear the conversation between the two but, she claims, her husband did not raise his voice. (*Id.* at 43:2–17.) Ms. Douglas says that, eventually, Moorer exited the office with the cart, picked up a green pumpkin from the basket, and said that the pumpkin had not

been paid for. (*Id.* at 43:20–23.) Moorer then purportedly went back into the office, re-exited, and said the item <u>had</u> been paid for. (*Id.* at 43:23–25.) Moorer purportedly spoke with an associate who instructed him to call the police. (*Id.* at 44:6–9.) Ms. Douglas confirms that her husband has attempted to receive treatment from multiple doctors, who refused to help because he had been injured by a police officer. (*Id.* at 50:6–14.)

<u>4. Sergeant Blackburn's Account</u>

Each of the three Officers who responded to Walmart's call for police assistance submitted affidavits as part of discovery in this Action. Charles Blackburn, a sergeant at the Sullivan County Sheriff's Patrol Division, recounted that on July 10, 2023, he was dispatched to Walmart to respond to a report of a disorderly individual involved in a shoplifting incident. (Officers' Mot., Blackburn Aff. ("Blackburn Aff.") ¶¶ 1–2 (Dkt. No. 81-4).) When he arrived at Walmart, he interviewed Moorer. (*Id.* ¶ 3.) Moorer showed him evidence that the Plaintiffs placed items in their cart that had not been paid; "[Moorer] showed [Blackburn] the items that were paid and not paid, and there was a clear disparity." (*Id.* ¶¶ 3–4.) This led Blackburn to believe that there existed probable cause to arrest the Plaintiffs for petit larceny. (*Id.* ¶ 5.)

Blackburn reports that Moorer "confirmed that he wanted to file a criminal complaint against [P]laintiffs," and, as part of that process, he needed to obtain Plaintiffs' identification. (*Id.* ¶ 6.) Blackburn explained that both Plaintiffs were under arrest, at which point Ms. Douglas surrendered her identification but Mr. Douglas did not. (*Id.* ¶ 7.) Mr. Douglas assertedly argued with Blackburn, becoming "increasingly irate when [Blackburn] explained to him that he was going to be arrested" and released with an appearance ticket. (*Id.* ¶ 9.) Blackburn took out handcuffs and instructed Mr. Douglas to place his hands behind his back, but he did not comply. (*Id.* ¶ 10.) Blackburn reports that Douglas said he was not under arrest, that he would be "calling

the real police," and took out his phone, walking towards the main door as if to exit the Walmart. (*Id.* ¶¶ 11–12.)

Blackburn handcuffed Mr. Douglas's right wrist as Mr. Douglas was moving towards the door. (*Id.* ¶ 13.) He says that he was unable to bring the wrist behind Mr. Douglas's back because "he resisted." (*Id.* ¶ 14.) Meyer grabbed Mr. Douglas's left arm while Mr. Douglas continued to resist. (*Id.* ¶ 15.) Bitjeman grabbed Mr. Douglas's legs, and he was "placed on the ground," with the asserted goal of making it "easier to use minimal force to place" his "hands behind his back." (*Id.* ¶¶ 16–17.) Douglas was handcuffed, and "stopped resisting," at which point he "did not communicate with any of the officers." (*Id.* ¶¶ 18–19.) Officer Blackburn perceived that Mr. Douglas was having a medical emergency "because he was breathing heavily and did not respond to [the officer's] questions about his wellbeing." (*Id.* ¶ 20.) Officer Blackburn called 911, and an ambulance brought Mr. Douglas to Garnet Hospital, accompanied by Deputy Meyer. (*Id.* ¶ 21.)

5. Deputy Meyer's Account

Rory Meyer, a Deputy at the Sullivan County Sheriff's Patrol Division, was dispatched to the Walmart to assist Sergeant Blackburn on July 10, 2023. (Officers' Mot., Meyer Aff. ("Meyer Aff.") ¶¶ 1–2 (Dkt. No. 81-5).) When he arrived, he saw Mr. Douglas yelling at Sergeant Blackburn. (*Id.* ¶ 3.) He reports that Douglas turned toward the door and stepped toward it, while not permitting Sergeant Blackburn to put his hand behind his back. (*Id.* ¶¶ 4–5.) Deputy Meyer "attempted to place" Mr. Douglas's hand behind his back, but felt Mr. Douglas pulling away from him. (*Id.* ¶ 6.) At this point, Bitjeman grabbed Mr. Douglas's legs to bring him to the ground; Mr. Douglas resisted and fell on top of Meyer's leg. (*Id.* ¶ 7.) The officers were then able to restrain Mr. Douglas. (*Id.* ¶ 8.)

Sergeant Blackburn called an ambulance. (*Id.* ¶ 9.) Meyer accompanied Mr. Douglas in the ambulance to Garnet Hospital. (*Id.* ¶ 11.) There, it appears examinations were conducted and, about three hours later, Mr. Douglas was discharged. (*Id.* ¶ 12.) A nurse purportedly told Meyer that there was no condition that required Mr. Douglas to spend the night in the hospital. (*Id.* ¶ 13.) Subsequently, Meyer took Douglas to the Sullivan County Patrol Division to give him an appearance ticket, after which Mr. Douglas was released. (*Id.* ¶¶ 14–15.)

6. Deputy Bitjeman's Account

Rachel Bitjeman, a Deputy at the Sullivan County Sheriff's Patrol Division, was dispatched to the Walmart to assist Sergeant Blackburn on July 10, 2023. (Officers' Mot., Bitjeman Aff. ("Bitjeman Aff.") ¶¶ 1–2 (Dkt. No. 81-6).) Upon arrival, she observed Mr. Douglas yelling at Sergeant Blackburn. (*Id.* ¶ 3.) Bitjeman says she "observed [Mr.] Douglas," upon being advised that he would be arrested, "resisting arrest when Blackburn placed a handcuff on his wrist." (*Id.* ¶ 4.) She says that, when instructed to put his hands behind his back, Mr. Douglas did not comply. (*Id.* ¶ 5.) She saw Meyer and Blackburn attempting to restrain Mr. Douglas, but they could not restrain him. (*Id.* ¶ 6.) She told Meyer that she would lift Mr. Douglas's legs to place him on the ground, and the two did so. (*Id.* ¶ 7.) At that point, Mr. Douglas was handcuffed, Blackburn called an ambulance, and Mr. Douglas was visibly in a medical emergency. (*Id.* ¶¶ 8–10.)

In short, all three Officers represent that Douglas was combative and resisted arrest, while Douglas represents that he was not and did not do so. It is undisputed that Mr. Douglas sustained some kind of injury in the arrest and that this injury (or at least, Mr. Douglas's symptoms) was serious enough that the Officers determined that Plaintiff needed medical attention.

7. Plaintiffs' Account of Fallout from the Incident

Mr. Douglas believes that the Walmart incident was publicized in the small town where they owned their restaurant and that the story negatively affected the restaurant that he and his wife owned and operated. (Mr. Douglas Dep. 81:7–82:8, 83:23–84:14.) Ms. Douglas further explained that, from the time that they opened their restaurant (before the Walmart incident), they experienced racially motivated mistreatment, such as a neighbor physically cutting the cable and internet cords attached to the building, and the building's sign being ripped from the building. (Ms. Douglas Dep. 16:4–8, 16:16–18.) This mistreatment led them, eventually, to move the restaurant from Liberty New York, to Monticello, New York. (*Id.* at 17:7–9.) After the Walmart incident, sales at Plaintiffs' restaurant declined, though Plaintiffs present somewhat inconsistent accounts about the store's past performance and decline. (Mr. Douglas Dep. 90:23–92:12; 98:21–25; Ms. Douglas Dep. 10:5–14:17.)

Explaining the connection between the incident and the store's decline, both Mr. Douglas and Ms. Douglas report that the Walmart incident was publicized through one of their former employees, Teefa, and her sister, known to them as "Trouble." (Mr. Douglas Dep. 81:7–16; 82:16–25, 84:18–90:10, 94:4–10; Ms. Douglas Dep. at 18:7–22:8.) Apparently, Trouble had a vendetta against the couple because Teefa had been fired from the business and knew of the incident because she had seen that Walmart posted a video of it online, though Ms. Douglas never saw the video. (Ms. Douglas Dep. 21:3–8, 21:16–22:6.) Trouble and Teefa reportedly spread rumors about the incident in the local community as payback for Teefa's being fired. (*See id.*) As further support for their argument that the incident harmed their business, Plaintiffs claim that members of the community also discussed the incident with the couple's niece, Makayla McKenzie. (*Id.* at 26:16–27:22.)

The Officers have also submitted certain of Mr. Douglas's medical records in support of their Motion for Summary Judgment. (*See* Officers' Mot., Ex. G.) These records are exclusively from the hospital visit Mr. Douglas had on July 11, 2023, immediately after the Walmart incident. (*See generally id.*) The records reflect that Mr. Douglas's chief complaint was an arm injury during the arrest that left "his right arm . . . immobile," that he "lost consciousness for 20–30 minutes," that he was "bitten by" a law enforcement officer "and has abrasions on his left shoulder." (*Id.* at 5.) The notes further suggest that Mr. Douglas's pain was reported as "mild in intensity." (*Id.* at 6.) The notes suggest that the abrasion on his shoulder was "[d]rying" and "not new," and that the provider did not note any bite marks on Mr. Douglas's left shoulder. (*Id.* at 7.) Plaintiff was discharged with ibuprofen and, it seems, given a TDAP vaccination. (*Id.* at 9.) It appears that X-Ray images were taken and that no fractures or dislocation were noted. (*Id.* at 10–12.) Nevertheless, Mr. Douglas maintains that his pain has persisted in the years since his accident, as well as breathing problems. (Mr. Douglas Dep. 84:5–7, 110:25–111:18, 112:21–113:5.) Ms. Douglas likewise recounted that Mr. Douglas continually sought treatment for these injuries, but that such treatment was denied by local providers until the couple moved to Queens County. (*See* Ms. Douglas Dep. 48:23–52:6.)

B. Procedural Background

On April 22, 2024, Plaintiffs commenced this Action. (*See* Compl. (Dkt. No. 1).) At the time the Action began, Plaintiffs were represented by counsel. (*Id.*) The case progressed through discovery. (*See generally* Dkt.) In December 2024, Plaintiffs' counsel filed a motion requesting to withdraw as attorney due to irreconcilable differences with his clients stemming from a disagreement about how the case should proceed. (Mot for Michael H. Sussman to Withdraw as Attorney (Dkt. No. 41); *see also* Affirmation of Michael H. Sussman, Esq. in Supp.

of Mot. to Withdraw (Dkt. No. 42).) Shortly thereafter, in mid-December, counsel for the Officers filed a letter seeking leave to file a motion for summary judgment. (*See* Letter from Khalid Bashjawish, Esq. to Court (Dec. 16, 2024) (Dkt. No. 45).) On January 10, 2025, the Court granted Plaintiffs' counsel's Motion to Withdraw. (Order Granting Mot. to Withdraw (Dkt. No. 46).)

On June 5, 2025, Plaintiffs filed a letter requesting leave to amend the operative complaint to add Sergeant Blackburn as a Defendant. (Letter from Willoughby Douglas to Court (June 5, 2025) (Dkt. No. 53).) At a status conference before the Magistrate Judge assigned to this Action, Judge Victoria Reznik, on June 6, 2025, Judge Reznik directed Defendant Walmart to "renew [its] search for video footage" of the incident, and Plaintiffs were directed to file their Amended Complaint by no later than June 30, 2025. (*See* Dkt. (Minute Entry dated June 16, 2025).)

On June 25, 2025, Plaintiffs filed their Amended Complaint. (Am. Compl. (Dkt. No. 56).) After further proceedings, the Court held a status conference on October 16, 2025, where the Court set a briefing schedule on Motions for Summary Judgment from the Officers as well as Walmart and Moorer. (*See* Dkt. (Minute Entry dated Oct. 16, 2025).) On December 5, 2025, Defendants Moorer and Walmart filed their Motion for Summary Judgment, (*see* Walmart's Mot.), along with supporting materials, including a Memorandum of Law, (Defs.' Mem. of Law ("Walmart's Mem.") (Dkt. No. 79-9)). On the same date, the Officers filed the Motion for Summary Judgment, (Officers' Mot.), along with supporting materials, including a Memorandum of Law, (Defs.' Mem. of Law ("Officers' Mem.") (Dkt. No. 81-3)).

After two brief extensions of time, (*see* Order Granting Mot. for Extension of Time (Dkt. No. 87); Order Granting Mot. for Extension of Time (Dkt. No. 89)), Plaintiffs filed a document

styled as a "Response to Defendant[s'] Rule 56.1 Statement." (Pls.' 56.1.) This document responds to only the first ten paragraphs of the Defendant Officers' 56.1 Statement, is unresponsive to Walmart and Moorer's Rule 56.1 Statement, and offers no legal argument. (*See generally id.*) Nevertheless, and as described above, the Court has conducted a searching review of the materials submitted in connection with the Motion for Summary Judgment, and treats as undisputed only facts that are actually undisputed on the record before it.

On April 20, 2026, Defendants filed their Replies, and briefing was complete. (*See* First Reply Mem. of Law in Supp. re: First Mot. for Summ. J. ("Officers' Reply") (Dkt. No. 94); Reply Aff. of Michael P. Cavanagh, Esq. in Supp. re: Mot. for Summ. J. (Dkt. No. 95).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . "). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation and quotation marks omitted)). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the

non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [the plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[ ] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. May 31, 2017) (same).

B. Analysis

1. Excessive Force

The Officers contend that there is no material dispute of fact as to Plaintiff's excessive force claim on the grounds that, in their view, the use of force was reasonable given the circumstances. (Officers' Mem. 3.) They contend that "[i]t is undisputed that Mr. Douglas was resisting arrest," that the officers "called an ambulance . . . because Mr. Douglas was not speaking," and that the injuries are *de minimis* on the grounds that there is insufficient evidence in the record of Plaintiff's medical treatment. (*Id.* at 3–6.) However, the Court's searching review of the record reveals that there is, in fact, a dispute of fact as to whether the use of force was excessive.

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (citation omitted). Accordingly, "courts should examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (citation and quotation marks omitted). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, italics, alteration, and quotation marks omitted).

"De minimis injuries can serve as evidence that de minimis force was used." *Kayo v. Mertz*, 531 F. Supp. 3d 774, 798 (S.D.N.Y. 2021) (collecting cases); *Dejesus v. City of Yonkers*, No. 22-CV-2817, 2025 WL 81386, at *12 (S.D.N.Y. Jan. 13, 2025) (same). However, a "[p]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient." *Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 177 (E.D.N.Y. 2010) (collecting cases) (quoting *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009)).

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005). "The injury requirement is 'particularly important.'" *Usavage v. Port Auth. of New York and New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (quoting *Sachs*, 2012 WL 3822220, at *14). For example, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008); *see Usavage*, 932 F. Supp. 2d at 592 (collecting cases). "These injuries need not be 'severe or permanent,' but must be more than merely 'de minimis.'" *Usavage*, 932 F. Supp. 2d at 592 (internal citations omitted).

As described above, it is undisputed that, after the incident, Plaintiff appeared to be nonresponsive, such that the Officers felt the need to transport him to the hospital. The *extent* of Mr. Douglas's injuries is certainly disputed: Defendants contend that the injuries are de minimis,

while Plaintiffs submit that they were serious and ongoing. But the Plaintiffs need not demonstrate a longstanding injury to make out an excessive force claim. At this juncture, they simply must introduce evidence sufficient to establish a dispute of material fact as to Plaintiff's injuries. *See Dejesus*, 2025 WL 81386, at *12 (noting, as part of denial of summary judgment on excessive force claim, that it was "undisputed that [the p]laintiffs received scratches and bruises during the course of arrest," and that they "went to a hospital, where [a plaintiff] received a pain injection and pills," while others of the plaintiffs "were given ibuprofen," and a plaintiff swore that she "has been treated by a doctor for pain management" since the incident); *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 431–32 (S.D.N.Y. 2012) (rejecting summary judgment on excessive force claim and relying on evidence, in form of the plaintiff's testimony, that an officer "punched him in the chest, without provocation, . . . at the beginning of their encounter" and the record supported the plaintiff's "contention that he was transported to [the hospital] and hospitalized . . . due to complaints of chest pains," among other facts).

The same is true of the Officers' assertion that Mr. Douglas was resisting arrest. While the Officers uniformly contend that he resisted, Mr. Douglas submits under penalty of perjury that he did not. (Mr. Douglas Dep. 54:23–55:10 (asserting that he voluntarily accepted the handcuffs); Blackburn Aff. ¶¶ 14–15 (stating that Mr. Douglas was resisting); Meyer Aff. ¶¶ 5–8 (same); Bitjeman Aff. ¶¶ 4–8 (same).) Given the conflicting version of events, "a reasonable jury could find that force was not warranted to effect [Mr. Douglas's] arrest." *Alvarez v. City of New York*, No. 11-CV-5464, 2015 WL 1499161, at *7 (S.D.N.Y. Mar. 30, 2015); *see also, e.g.*, *Piatetsky v. Port Auth. of New York & New Jersey*, No. 24-CV-9136, 2026 WL 1399468, at *12–13 (S.D.N.Y. May 19, 2026) (rejecting summary judgment on excessive force claim where some material in the record, including the plaintiff's own testimony, supported that he had sustained

more than de minimis injury and explaining that the extent of the injuries was a matter for a jury to consider when assessing "both the reasonableness of the force and potential damages from any misconduct," rather than a basis to grant summary judgment); *Dejesus*, 2025 WL 81386, at *13 ("Given the conflicting version of events, a reasonable jury could find that force was not warranted to effect [the p]laintiffs' arrests." (quotation marks omitted and alterations adopted)); *Weather v. City of Mount Vernon*, No. 08-CV-192, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011) ("Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required.").

The Officers argue that, because Plaintiff does not satisfy the elements for an excessive force claim based on the use of handcuffs, they are entitled to summary judgment on his excessive force claim. (Officers' Mem. 3–4.) But even if the use of handcuffs was reasonable, this does not mean that the overall use of force was reasonable. *See, e.g.*, *Livecchi v. City of Geneva*, No. 14-CV-6326, 2019 WL 315293, at *11 (W.D.N.Y. Jan. 24, 2019) ("[The separate handcuffing use of force] analysis applies only where it was reasonable for a police officer to apply handcuffs in the first place. In a situation where it was not reasonable for the officer to apply handcuffs in the first instance, the fact that the plaintiff was not injured (or did not complain of discomfort) does not excuse the excessive use of force." (footnote omitted)); *Rickettes v. Turton*, No. 12-CV-6427, 2015 WL 3868070, at *7 (E.D.N.Y. June 23, 2015) ("[T]he use of excessive force in greeting a suspect with a gratuitous attack might render the use of force in handcuffing a suspect excessive, even if that same force used in applying the handcuffs would not be excessive if viewed in isolation, because the additional difficulty in applying the handcuffs and the force required to do that could be the direct result of the excessive force used in attacking him." (wholly quoting *Rasmussen v. City of New York,* 766 F.

Supp. 2d 399, 405 (E.D.N.Y. 2011))). A jury need not "dissect[] a . . . police encounter into its separate components in an excessive force case," but instead may consider the use of force holistically. *Rasmussen*, 766 F. Supp. 2d at 405. Accordingly, the material dispute of fact as to the reasonableness of the force used defeats summary judgment even if Plaintiffs have not demonstrated a dispute of material fact that is specific to the decision to handcuff Mr. Douglas.

Finally, the Officers emphasize, at least in passing, that the sole medical evidence related to Mr. Douglas's treatment is notes from his admission to Garnet Hospital which do not support the existence of a serious and lasting injury. (Officers' Mem. 5; Officers' Mot., Ex. G.) They submit that "[t]he only evidence of an injury is an abrasion on Mr. Douglas'[s] wrist," and "further, there is no evidence in the record that [Mr. Douglas] sought treatment after the date of the arrest to demonstrate a continuing injury and to demonstrate that the abrasion was more tha[n] *de minimis*." (Officers' Mem. 5.) But "to make out an excessive force claim, it is not [even] necessary that the plaintiff sustain an injury that necessitates medical treatment or a doctor's visit." *McKenzie v. City of New York*, No. 17-CV-4899, 2019 WL 3288267, at *9 (S.D.N.Y. July 22, 2019); *see also Shaheed v. City of New York*, 287 F. Supp. 3d 438, 453 (S.D.N.Y. 2018) ("[M]edical treatment is not a required element of an excessive force claim."), *aff'd sub nom. Shaheed v. Kroski*, 833 F. App'x 868 (2d Cir. 2020); *Ikezi v. City of New York*, No. 14-CV-5905, 2017 WL 1233841, at *15 (E.D.N.Y. Mar. 31, 2017) ("[A]lthough [the p]laintiffs submit no medical-records evidence to support the existence and extent of their injuries, the lack of such evidence is not fatal to their excessive force claim [even at summary judgment]."). Further, Plaintiff avers that he *has* sought additional treatment, but that he faced discrimination in Sullivan County and that doctors refused to treat him. This evidence, while thin, suggests a material dispute of fact as to *whether* Plaintiff's injuries have persisted, and

further undermines Defendants' argument that no reasonable juror could find excessive force had been used. *See Wist v. Middletown Police Dep't*, No. 22-CV-7570, 2025 WL 2592544, at *8–9 (S.D.N.Y. Sept. 8, 2025) (acknowledging that, even though conclusive medical documents weighed against a plaintiff's "word alone" can defeat summary judgment, where "medical records do not irrefutably contradict" the plaintiff's claims, and even "support that he suffered" certain minor injuries consistent with his account, summary judgment is not appropriate); *McKinley v. Crevatas*, No. 20-CV-3606, 2023 WL 4364182, at *17 (S.D.N.Y. July 6, 2023) ("A jury could share Defendants' skepticism about Plaintiff's failure to seek medical attention for the full extent of his purported injuries, conclude that he was never kicked, and find that the force used in arresting Plaintiff was proportionate to the circumstances. But if it instead credits Plaintiff's testimony that an officer kicked him in the face after he was handcuffed and had stopped struggling with the officers, Plaintiff could succeed on his excessive force claim."); *Ross v. Willis*, No. 16-CV-6704, 2021 WL 3500163, at *12 (S.D.N.Y. Aug. 9, 2021) (concluding that the defendants were not entitled to summary judgment where evidence suggested that, during arrest, the plaintiff was "gasping for air," stated "multiple times that he could not breathe," and later testified that he "experienced symptoms akin to those in an asthma attack," even though he "was relieved by [a] decontamination shower and his medical report showed, several hours later, that he was no longer in distress"); *cf. Kayo v. Mertz*, 531 F. Supp. 3d 774, 798 (S.D.N.Y. 2021) (concluding that summary judgment was warranted where the plaintiff "testified that he not only did not seek medical treatment" but also "did not even treat his injuries himself" and did not testify that "any scrape or pain lasted for any period following his arrest").

In short, this is the ordinary case where the jury has the "unique task . . . to determine the amount of force used, the injuries suffered[,] and the objective reasonableness of the [O]fficer[s']

conduct." *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999). While, as described in the factual background section, Plaintiffs—and specifically Mr. Douglas—made "several statements that were . . . self-contradictory," they were not of such a nature that no reasonable person would suspend their disbelief to credit Plaintiffs' allegations. *Hicks v. Village of Ossining*, 2016 WL 345582, at *5 (S.D.N.Y. Jan. 27, 2016).[5]

2. False Arrest[6]

The Court construes Plaintiff's Amended Complaint as raising a false arrest cause of action. (*See* Am. Compl. ¶¶ 54–55.) A Section 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *accord Dejesus v. City of*

---

[5] The Court notes that there is no evidence of any kind, aside from Mr. Douglas's word, that any Officer bit him in a way that caused injury. (Mr. Douglas Dep. at 55:4–6, 55:17.) Officers' Mot., Ex. G (treating provider noting that Mr. Douglas had "abrasions on his left shoulder" but noting also that it was a "[d]rying abrasion" that was "not new" and that "[n]o bite marks [were] noted on the left shoulder"). Insofar as Plaintiffs wish to assert a claim based on Mr. Douglas having been bitten in the shoulder, the "undisputed medical records directly and irrefutably contradict . . . [P]laintiff's descriptions of his injuries," such that "no reasonable jury could credit plaintiff's account of" having been bitten such that he was injured during the events at the Walmart. *Johnson v. City of New York*, No. 19-CV-8745, 2025 WL 2776053, at *6 (S.D.N.Y. Sept. 30, 2025).

[6] Plaintiff's Amended Complaint appears to state a separate Cause of Action for false imprisonment. (*See* Am. Compl. ¶¶ 56–57.) "False arrest is simply false imprisonment accomplished by means of an unlawful arrest . . . . False arrest and false imprisonment are largely synonymous because an imprisonment starts at the moment of arrest." *Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007); *see also Lazare v. City of New York*, No. 19-CV-2274, 2021 WL 6051625, at *3 n.8 (E.D.N.Y. Dec. 21, 2021) (treating the two causes of action jointly); *Washington v. Town of Greece*, 6 N.Y.S.3d 852, 854 (App. Div. 2015) ("[T]he causes of action for false arrest and false imprisonment are synonymous and our analysis treats them as such." (citation omitted)); *Salvodon v. City of New York,* 55 N.Y.S.3d 694, at *6 (N.Y. Sup. Ct. 2017) (describing the claim of false imprisonment as "part and parcel" of a claim for false arrest, explaining "no separate claim of false imprisonment exists" and noting that "false arrest and unlawful imprisonment are functionally synonymous, the distinction being merely semantic"). Accordingly, these two claims are analyzed together.

*Yonkers*, No. 22-CV-2817, 2025 WL 81386, at *5 (S.D.N.Y. Jan. 13, 2025) (same). A Section 1983 false arrest claim is substantially the same as a claim of false arrest under New York law. *Weyant*, 101 F.3d at 852; *see also Higginbotham v. Sylvester*, 741 F. App'x 28, 30 (2d Cir. 2018) (summary order) (same); *Delgado v. City of New York*, No. 19-CV-632, 2023 WL 6390134, at *8 (S.D.N.Y. Oct. 2, 2023) (same). New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at *5 (S.D.N.Y. July 20, 2022) (citation omitted). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . under [Section] 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at *3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest . . . will defeat a claim of false arrest under the Fourth Amendment."); *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006) ("[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime.").

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Collier v. City of Mount Vernon*, No. 19-CV-523, 2024 WL 4043135, at *8 (S.D.N.Y. Sept. 4, 2024) (quoting *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *8 (S.D.N.Y. Sept. 28, 2023) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012))); *see*

*also United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (per curiam) (same). As the Second Circuit has observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on "a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted). "On summary judgment, the existence of probable cause or arguable cause may be determined as a matter of law where 'there is no dispute as to the pertinent events and the knowledge of the officers.'" *Shaheed v. City of New York*, 287 F. Supp. 3d 438, 449 (S.D.N.Y. 2018) (quoting *Weyant*, 101 F.3d at 852).

Plaintiffs were arrested for Petit Larceny in violation of New York Penal Law Section 155.25, as well as resisting arrest. (Am. Compl. ¶ 34; Officers' 56.1 ¶¶ 10, 12, 32.)[7] Because the Court determines that the undisputed evidence demonstrates that probable cause did, indeed, exist to arrest Plaintiffs for petit larceny, the false arrest claim fails.

Pursuant to New York Penal Law: "A person . . . commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." N.Y. Penal Law § 155.05(1). "Deprive" is defined as "(a) to withhold [the property] or cause it to be withheld from [the owner] permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (b) to dispose of the property in

---

[7] No materials submitted to the Court appear to contradict the Defendants' 56.1 statement on this point, and Plaintiffs do not appear to have contested this point. (*See* Pls.' 56.1.)

such manner or under such circumstances as to render it unlikely that an owner will recover such property." N.Y. Penal Law § 155.00(3).

The admissible and undisputed evidence in the record supports a finding of probable cause to arrest Mr. Douglas for suspected involvement in a larceny. It is undisputed that, at the time Sergeant Blackburn arrived at Walmart, Blackburn had been informed (rightly or wrongly) that there was an incident of shoplifting occurring at the store. (*See* Pls.' 56.1 ¶¶ 8–9 (contesting whether Plaintiffs had actually been shoplifting, but not contesting that the Officers were told that shoplifting had occurred); Blackburn Aff. ¶¶ 2–3 (explaining that Blackburn was dispatched in response to a report of shoplifting, and that he interviewed Moorer to confirm this claim upon arrival at the store); Meyer Aff. ¶ 2 (explaining Meyer was dispatched to assist Blackburn with reported shoplifting).) It is also undisputed that Moorer, "observ[ed] . . . Plaintiff . . . on the store's surveillance monitors" putting "goods into" the cart before leaving the store, and believed that some of those goods had not been paid for. *Hamell v. City of Utica*, No. 16-CV-991, 2019 WL 1933938, at *10 (N.D.N.Y. May 1, 2019). (*See* Officers' 56.1 ¶ 5.) Courts in this District and within the Second Circuit have held that where an officer arrests a Plaintiff "based on information [the officer] obtained through her interview of" a victim, who "told [the officer] that [that person] had seen [the plaintiff]" engaged in incriminating behavior, and particularly where "the record contains nothing—other than [the plaintiff's] own unsupported denials—to cast doubt on [the victim's] account," probable cause for the crime of larceny exists and a claim for false arrest cannot lie. *Johnson v. City of New York*, No. 08-CV-5277, 2010 WL 2292209, at *4 (S.D.N.Y. June 7, 2010); *see also Ackridge v. New Rochelle City Police Dep't*, No. 09-CV-10396, 2011 WL 5082421, at *6 (S.D.N.Y. Sept. 26, 2011) ("[B]ased on [the witness's] statement that she herself witnessed [the p]laintiff trying to steal [a] laptop charger, [the

defendant officer] had probable cause to arrest [the p]laintiff for attempted larceny."), *report and recommendation adopted*, 2011 WL 5101570 (S.D.N.Y. Oct. 25, 2011); *Malik v. McGinnis*, No. 06-CV-3361, 2010 WL 3239216, at *2 (S.D.N.Y. Aug. 16, 2010) (holding that a law enforcement officer, when told that the plaintiff had attempted to take alleged victim's pocketbook, had probable cause to arrest the plaintiff for larceny), *report and recommendation adopted*, No. 06-CV-3361, 2010 WL 4840131 (S.D.N.Y. Nov. 17, 2010); *Bacci v. Fairway Mkt.*, No. 06-CV-2407, 2008 WL 2139132, at *7 (S.D.N.Y. May 19, 2008) (holding that arresting officers, who were called to the store by eyewitness who reported seeing the plaintiff attempt to leave a grocery store with "a number of un-purchased food items . . . concealed in his inside jacket pocket," had probable cause to arrest the plaintiff for shoplifting).[8] Accordingly, Defendants are entitled to summary judgment on the Second and Third Causes of Action in the Amended Complaint.[9]

---

[8] The Court need not consider whether probable cause existed to charge Mr. Douglas with resisting arrest: "To defeat a false arrest claim, an arresting officer need not have had probable cause to arrest the plaintiff for the specific offense invoked by the officer at the time of the arrest, or the offense with which the plaintiff was charged. As long as there was probable cause to arrest the plaintiff for some offense, a false arrest claim will fail." *Jimenez v. City of New Rochelle*, No. 19 CV 2525, 2021 WL 1178090, at *5 (S.D.N.Y. Mar. 29, 2021) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) and *Jaegly*, 439 F.3d at 152). Accordingly, the factual disputes between the Parties as to the interactions between Mr. Douglas and the Officers are immaterial.

[9] At no point in this Action have Plaintiffs attempted to raise a false arrest claim against Moorer based on his reporting their alleged shoplifting to the police. (*See generally* Compl. (not raising such a claim); Am. Compl. (same).) Even construing the Amended Complaint charitably (in light of Plaintiffs' now pro se status) to state such a claim, it fails. "The Second Circuit has held that where a private security guard detains an individual for suspected shoplifting and police officers later arrest that individual solely based on the security guard's allegations of criminal wrongdoing, the private security guard's behavior does not rise to the level of state action because there is no 'nexus' between the state and the challenged private action sufficient to attribute the private action to the state." *Wieder v. City of New York*, No. 09-CV-3914, 2013 WL 1810751, at *8 (E.D.N.Y. Apr. 29, 2013) (citing *Prowisor v. Bon-Ton, Inc.*, 232 F. App'x 26, 28 (2d Cir. 2007) (summary order)), *aff'd*, 569 F. App'x 28 (2d Cir. 2014). Here, Moorer "did not

3. Malicious Prosecution

In order to "state a § 1983 malicious prosecution claim a plaintiff 'must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law.'" *Rodriguez v. City of N.Y.*, 623 F. Supp. 3d 225, 238 (S.D.N.Y. 2022) (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 179 (2d Cir. 2022)); *see also Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *19 (S.D.N.Y. Mar. 29, 2023) (same). To establish the elements of a malicious prosecution claim under New York law, the plaintiff must demonstrate "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." *Dettelis v. Sharbaugh*, 919 F.3d 161, 163–64 (2d Cir. 2019) (quotation marks and citation omitted).

In their interrogatory responses, Plaintiffs acknowledged that their charges were dismissed pursuant to an adjournment in contemplation of dismissal. (Walmart's Mot., Ex. E, at 4 (Dkt. No. 79-6).) Defendants seize on this admission to argue that this admission extinguishes

---

act pursuant to state authority, nor did he act jointly with the defendant police officers" in arresting or detaining Mr. Douglas. *Id.* Accordingly, even if the Amended Complaint contained this claim, it would fail. *See McArthur v. Yale New Haven Hosp.*, No. 20-CV-998, 2021 WL 3725996, at *7 (D. Conn. Aug. 23, 2021) ("In the normal course, private security guards are not state actors and do not act under color of state law."); *Coleman v. City of New York*, No. 18-CV-11819, 2020 WL 905709, at *4 (S.D.N.Y. Feb. 25, 2020) ("'Courts in this Circuit have repeatedly found . . . allegations insufficient to establish the requisite nexus to state action' where plaintiffs allege that private security guards, 'after detaining plaintiffs on suspicion of shoplifting, called the police [and] provided a supporting deposition containing allegations of shoplifting, and [the] plaintiffs were arrested.'" (quoting *Orellana v. Macy's Retail Holdings, Inc.*, No. 17-CV-5192, 2018 WL 3368716, at *18 (S.D.N.Y. July 10, 2018)).

their malicious prosecution claims because an adjournment with contemplation of dismissal is not a favorable termination of the criminal case. (Officers' Mem. 7.). However, the cases Defendants cite all pre-date *Thompson v. Clark*, 596 U.S. 36, 39 (2022), in which the Supreme Court held that, for a Fourth Amendment malicious-prosecution claim under § 1983, the plaintiff need only show that the prosecution "ended without a conviction." In reaching this result, "the Supreme Court rejected the notion that treatment of a dismissal without reasons as a favorable termination would lead inevitably to a civil case on the issue of guilt or innocence, stating that 'requiring a plaintiff to show that his prosecution ended with an affirmative indication of innocence is not necessary to protect officers from unwarranted civil suits—among other things, officers are still protected by the requirement that the plaintiff show the absence of probable case and by qualified immunity.'" *Perez v. City of N.Y.*, 2022 WL 4236338, at *14 (S.D.N.Y. Sept. 14, 2022) (quoting *Thompson*, 596 U.S. at 39–40).

Since *Thompson*, the courts within the Second Circuit have held that an adjournment in contemplation of dismissal is a favorable termination for a malicious prosecution claim brought pursuant to § 1983. *See, e.g.*, *Williams v. The City of N.Y.*, No. 24-CV-806,, 2026 WL 2243017, at *9 (S.D.N.Y. Aug. 4, 2026) ("An adjournment in contemplation of dismissal does not bar Plaintiff's federal malicious prosecution claims . . ."); *Atkinson v. City of Newburgh*, No. 24-CV-6724, 2026 WL 1865119, at *10 (S.D.N.Y. June 29, 2026) ("[A]lthough an ACD may not constitute favorable termination for purposes of a New York malicious prosecution claim, the ACD does not, by itself, defeat the favorable-termination element of Plaintiff's Fourth Amendment malicious prosecution claim under Section 1983."); *Perez*, 2022 WL 4236338, at *14 (holding that in light of *Thompson*, the plaintiff met the favorable termination requirement by citing the adjournment in contemplation of dismissal).

Plaintiffs therefore satisfy the favorable termination element of their malicious prosecution claims. Their claim arising from the larceny charge nevertheless falters because of the existence of probable cause. As discussed above, the Court agrees with Defendants that the undisputed evidence establishes that there was probable cause to arrest Plaintiffs for larceny. *See Dettelis*, 919 F.3d at 163–64 (plaintiff must demonstrate that there is "lack of probable cause for commencing the proceeding" as one of the elements of a malicious prosecution claim); *Xu v. City of New York*, No. 18-CV-1222, 2020 WL 2088301, at *9 (S.D.N.Y. Apr. 30, 2020) (granting summary judgment for defendants in a malicious prosecution claim because they "had probable cause to commence the proceeding against Plaintiff," despite it being "undisputed that the criminal proceeding was ultimately terminated in Plaintiff's favor").

By contrast, because there is a dispute about whether Defendants had probable cause to arrest Plaintiff for resisting arrest, as noted above, his subsequent prosecution is not privileged on this ground.[10] *See D'Angelo v. Kirschner*, 288 Fed. App'x 724, 726–27 (2d Cir. 2008) (summary order) (holding that "a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor"); *Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989) (claim of malicious prosecution on charge of resisting arrest, of which plaintiff was acquitted, was not barred by his conviction for disorderly conduct).

Accordingly, summary judgment is granted to Defendants on the Fourth, Fifth, and Sixth Causes of Action in the Amended Complaint, except as to the malicious prosecution claim as it relates to the resisting arrest charge.

---

[10] Defendants do not argue that Plaintiffs' malicious prosecution claims fail for lack of evidence of actual malice. (Officers' Mem. 10.). Accordingly, the Court does not address that element.

III. Conclusion

For the reasons set forth above, the Officers' Motion for Summary Judgment is granted in part and denied in part. Walmart and Moorer's Motion for Summary Judgment is granted in its entirety. The Clerk of the Court is respectfully directed to terminate the pending Motions at Dkt. No. 79, Dkt. No. 81, and Dkt. No. 85, and to mail a copy of this Opinion to Plaintiffs.

SO ORDERED.

Dated: September 28, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge